## PEOPLE v. MATTHEWS

1. CRIMINAL LAW—CONSTITUTIONAL LAW—WAIVER OF RIGHTS.

A valid waiver of the privilege against self-incrimination and the right to counsel at the accusatory stage of criminal proceedings does not require a specific statement that an accused waives those constitutional rights.

REFERENCES FOR POINTS IN HEADNOTES

[1] 16 Am Jur 2d, Constitutional Law §§ 131, 135, 136.
[2] 21 Am Jur 2d, Criminal Law §§ 357–359, 362, 367.
[3, 4] 21 Am Jur 2d, Criminal Law §§ 316–319, 446.
[5] 21 Am Jur 2d, Criminal Law §§ 349–354, 357, 360, 367, 449.
[6] 21 Am Jur 2d, Criminal Law § 222.
[7] 21 Am Jur 2d, Criminal Law §§ 357, 367, 449.
[8] 21 Am Jur 2d, Criminal Law §§ 334, 341, 356, 361, 368.
[9] 21 Am Jur 2d, Criminal Law § 585.

2. CRIMINAL LAW—CONSTITUTIONAL LAW—WAIVER OF RIGHTS—PROOF.

Whether a defendant waived his privilege against self-incrimination and his right to counsel is a matter of proof.

3. CRIMINAL LAW—CONSTITUTIONAL LAW—WAIVER OF COUNSEL—GUIDELINES.

The Michigan Supreme Court guidelines relating to waiver of counsel in guilty plea examinations should also be followed in custodial interrogation situations. ·

4. CRIMINAL LAW—CONSTITUTIONAL LAW—WAIVER OF COUNSEL.

Waiver of counsel may not be inferred from a silent record since a right cannot be waived where there is no showing that an accused was aware of his right.

5. CRIMINAL LAW—CONSTITUTIONAL LAW—WAIVER OF RIGHTS—INCRIMINATING STATEMENT.

Defendant's incriminating statement which was made after he intelligently, knowingly and voluntarily waived his privilege against self-incrimination and his right to counsel was properly admitted at his trial, where defendant not only had initiated the interview which resulted in that statement, but also had signed two form cards that he had been warned of his constitutional rights before making his statement, and there was no evidence of threats, trickery, cajolery, lengthy interrogation or incommunicado incarceration before defendant made his statement.

6. CRIMINAL LAW—CONFESSION—VOLUNTARINESS—DETENTION.

The test as to whether a detention renders a confession involuntary is not the reasonableness of the length of time a person is detained but whether the detention has been used to coerce a confession.

7. APPEAL AND ERROR—WITNESSES—TESTIMONY—ACCUSED'S CUSTODIAL INTERROGATION—ACCUSED'S SILENCE—ADMISSIBILITY.

Detective's testimony that he had warned defendant of his constitutional rights before any custodial interrogation and that defendant thereafter declined to make any statement was not erroneously admitted where defendant made no objection to such testimony and therefore did not preserve that issue for review.

8. CRIMINAL LAW—SHOWUP—APPEAL AND ERROR.

Defendant's claim that he had no attorney present at identification showups was not preserved for appellate review where there was no objection to the in-court identification at his trial.

9. CRIMINAL LAW—SENTENCE—JUVENILE RECORDS.

Consideration of a defendant's juvenile record in determining his sentence is proper.

Appeal from Recorder's Court of Detroit, Robert E. DeMascio, J. Submitted Division 1 January 15, 1970, at Detroit. (Docket No. 6,969.) Decided March 25, 1970. Leave to appeal denied September 22, 1970. 384 Mich 754.

Larry Matthews was convicted of robbery unarmed. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Samuel J. Torina,* Chief Appellate Lawyer, and *Patricia J. Pernick,* Assistant Prosecuting Attorney, for the people.

*Carl Levin* and *Arthur J. Tarnow* (Defenders' Office—Legal Aid and Defender Association of Detroit), for defendant on appeal.

Before: DANHOF, P. J., and FITZGERALD and McGREGOR, JJ.

DANHOF, J. Following a nonjury trial, defendant was convicted of robbery unarmed, CL 1948, § 750.530 (Stat Ann 1954 Rev § 28.798). On appeal defendant makes numerous allegations of error, the principal one being that he did not specifically waive his right to counsel prior to and during custodial interrogation.

The prosecution accepted the statement of facts presented in the defendant's brief as follows:

"On July 9, 1967, at 8:15 a.m., defendant, who had been arrested the previous day for allegedly snatching a purse from Gladys Pritchard was allegedly informed of his constitutional rights by Detective James Harkness.

" 'Q. What did you say to him?

" 'A. That he had a right to remain silent; that anything he said may be used against him; and he didn't have to answer any questions or make any statement; any statement he may make may be used against him in a court of law. I advised him that he had a right to an attorney present before he answered any questions or made any statement, and the attorney could be with him while he made any statement or answered any questions. I advised him that if he could not afford an attorney one would be appointed by the court prior to any questioning. I advised him that he can at any time exercise his rights and not make any statement or answer any questions.

" 'Q. Did he sign any form at any time?

" 'A. He did. He indicated that he did not wish to make any statement at that time, and he signed it  *   *   *  '   (T. 62, 63.)

"At 3:45 p.m. on July 9, 1967, after defendant allegedly told the doorman at the precinct that he wished to see Detective Harkness, the detective allegedly again advised defendant of his constitutional rights, as follows:

" 'Q. After talking to the doorman, what did you do?

" 'A. I again advised Larry Matthews of his constitutional rights at 3:45 p.m. I advised him of the same—do you want me to read it again?

" 'Q. No. Did you follow the same procedure in the same general language that you did the first time?

" 'A. I did.

" 'Q. At that time was he asked to sign anything?
" 'A. He was.
" 'Q. And did he sign?
" 'A. He signed his name, yes.
" 'Q. He signed his name on a form?
" 'A. He did, indicating that he understood his constitutional rights, and further agreed that he wanted to make a statement. (T. 66.)
" 'Q. The second time did you tell him that he had a right to have his counsel there, now that he is going to make a statement; "Do you want your lawyer here?" Did you put it that way?
" 'A. I read the following—
" 'Q. Just answer my question, officer. Did you say to this defendant—
" 'A. I said he could have an attorney present when he made a statement.
" 'Q. Did you do that the second time?
" 'A. I did.' (T. 70.)
"Over the objection of defense counsel (T. 63, 67–69, 72), the court ruled that the statement was voluntary (T. 73).

"The statement allegedly made by defendant Matthews was then read into evidence (T. 73). It placed defendant at the scene of the purse snatching with the other defendant James Kent and placed the responsibility on James Kent. It conflicted with defendant Matthews' testimony at trial at which he denied being present at all (T. 82–94).

"Defendant was found guilty of robbery unarmed and was sentenced to from 7 or 9 [*sic*] to 15 years in prison.

"At the time of sentencing, the following statements were made by the court:

" 'The Court: Oh, he has a terrible record. He's seventeen years old now; and I imagine that his record goes back to 1960; and you know that must make him 10 years old; and he's been involved in criminal activity since the age of 10;  *   *   *  ,' (Transcript of sentence, p 3.)

" 'Now, let me just read you some of the offenses,
Mr. Bledsoe, that this boy at the age of 17 has on
his record:  *  *  *  '  (Transcript of sentence, p 4.)

" 'So I would not tolerate one bit the notion that
this boy hasn't got a record as an adult; and I want
to say that as far as I'm concerned he's got a long
record; he's as hardened a criminal as I've ever
seen; and the only thing that happened to change
the situation was that he had a birthday that made
him 17, and he couldn't even control that. But that
carries him right up.' "  (Transcript of sentence,
p 5.)

"Defendant's motion for new trial was denied by
the trial court."

Defendant does not deny that he was advised of
the warnings required by *Miranda* v. *Arizona*
(1966), 384 US 436 (86 S Ct 1602; 16 L Ed 2d 694,
10 ALR3d 974). Rather, defendant asserts that his
failure to *specifically* waive his right to counsel after
being advised of his rights bars the admission at
trial of any statements made by him during his
custodial interrogation. Some of the language from
the *Miranda* case tends to support defendant's posi-
tion. For example, at p 470 (86 S Ct at p 1626;
16 L Ed 2d at p 721, 10 ALR3d at p 1009 the *Miranda*
opinion states,

"No effective waiver of the right to counsel during
interrogation can be recognized unless specifically
made after the warnings we here delineate have
been given."

At p 475 (86 S Ct at p 1628; 16 L Ed 2d at p 724,
10 ALR3d at p 1012) the *Miranda* court wrote,

"An express statement that the individual is will-
ing to make a statement and does not want an attor-
ney followed closely by a statement could constitute
a waiver. But a valid waiver will not be presumed
simply from the silence of the accused after warn-

ings are given or simply from the fact that a confession was in fact eventually obtained."

The people deny that *Miranda* or other controlling authority requires a defendant's specific waiver of in-custody constitutional rights, *in haec verba,* in order for a confession or statement to be admissible at trial. Instead, the people urge this Court to adopt a rule consistent with previous decisions of the Michigan Supreme Court stating that a valid waiver of the privilege against self-incrimination and the right to counsel at the accusatory stage of proceedings does not require a specific statement that the accused waives his specific constitutional rights.

Apparently, this issue is now before an appellate court of this State for the first time. Examination of numerous opinions from other jurisdictions where the courts have considered this question demonstrates that there is a split of authority in this country as to what constitutes waiver of the privilege against self-incrimination and the right to counsel since the *Miranda* decision.

Defendant has relied primarily on *United States* v. *Low* (WD Pa, 1966), 257 F Supp 606; *Evans* v. *United States* (CA 8, 1967), 375 F2d 355; *Sullins* v. *United States* (CA 10, 1968), 389 F2d 985; *People* v. *Anonymous* (1968), 58 Misc 2d 13 (294 NYS2d 248); *United States* v. *Bird* (D Mont, 1968), 293 F Supp 1265; and *United States* v. *Nielsen* (CA 7, 1968), 392 F2d 849.

After careful review of these cases, we think all are distinguishable except *Sullins* v. *United States* and *People* v. *Anonymous,* and we reject the *per se* definition of waiver recognized in those two. Additionally, we note that the *Sullins* holding, that *Miranda* requires the accused to specifically decline consultation with a lawyer to constitute a valid

waiver, was modified less than six months later by
*Bond* v. *United States* (CA 10, 1968), 397 F2d 162.
The *Bond* court said, p 165:

"We do not read *Miranda* to hold that 'an express
declination of the right to counsel is an absolute
from which, and only from which, a valid waiver
can flow.'" (Citing the concurring and dissenting
opinion in *Sullins*.)

The position adopted by the people and followed
by the trial court, that there can be a waiver with-
out the use of specific or magic words, is supported
by decisions from a number of jurisdictions. In
*People* v. *Johnson* (1969), 70 Cal 2d 541 (75 Cal
Rptr 401, 450 P2d 865) (reversing on other
grounds), *cert denied*, 395 US 969 (89 S Ct 2120;
23 L Ed 2d 758), the court said, p 558 (75 Cal Rptr
at p 412, 450 P2d at p 876):

"Once the defendant has been informed of his
rights and indicates that he understands those
rights, it would seem that his choosing to speak and
not requesting a lawyer is sufficient evidence that
he knows his rights and chooses not to exercise
them."

That rule was followed in *People* v. *Jarvis* (1969),
276 Cal App 2d 534 (80 Cal Rptr 832).

There was a similar holding in *Hill* v. *State* (Fla,
1969), 223 So 2d 548, where the court said, p 549:

"Therefore, *Miranda* does not require any affirm-
ative oral or written waiver of counsel by the ac-
cused, although if 'he indicates in any manner and
at any stage of the process that he wishes to consult
with an attorney before speaking there could be
no questioning.'"

In *State* v. *Flores* (1969), 9 Ariz App 502 (454
P2d 172), the court said, p 507 (454 P2d at p 177):

"There was evidence the *Miranda* warnings had been given three times, and a rundown of the wording of the confession as well as the rights cards indicated defendant had an inarticulate but basic understanding of the wording."

Of like import is the decision in *State* v. *Pace* (1969), 80 NM 364 (456 P2d 197).

We think the better rule, that the waiver issue is a matter of proof, is well-stated in *United States* v. *Hayes* (CA 4, 1967), 385 F2d 375, 377, 378:

"Thus, we cannot accept appellant's suggestion that because he did not make a statement—written or oral—that he fully understood and voluntarily waived his rights after admittedly receiving the appropriate warnings, his subsequent answers were automatically rendered inadmissible. Of course, the attendant facts must show clearly and convincingly that he did relinquish his constitutional rights knowingly, intelligently and voluntarily, but a statement by the defendant to that effect is not an essential link in the chain of proof. On the other hand, mere silence of the accused followed by grudging responses to leading questions will be entitled to very little probative value in light of the inherently coercive atmosphere of in-custody interrogation. The government will have to prove more."

The court then noted a number of factors justifying a conclusion that defendant's statements were knowingly and intelligently made. Among the facts which the court considered significant were the lack of physical or psychological coercion, defendant's alert and healthy appearance, defendant's use of a telephone after being given *Miranda* warnings, and defendant's request for an attorney after brief questioning.

The aforementioned decisions, while not binding upon this Court, appear to provide the same guide-

lines as followed by the Michigan Supreme Court
with respect to waiver of counsel in guilty plea
examinations. We think these guidelines should also
be followed by Michigan courts in the custodial in-
terrogation situation.

In *People* v. *Hobdy* (1968), 380 Mich 686, the
Michigan Supreme Court overruled this Court which
had held that where the defendant did not *expressly
waive* his right to counsel the defendant's plea of
guilty must be set aside and the case remanded for
trial. Justice O'HARA, writing for the majority,
said, pp 689, 690:

"Since the Court of Appeals based its decision
squarely on the issue of *express* waiver, we address
ourselves only to that issue.

*    *    *

"It is not contended by defendant that the circuit
judge did not advise him of his *right* to retained
counsel or to counsel at public expense if he were
indigent. His only complaint is that he did not
*expressly* waive the right. Outside of the non-
precedential *Palmer,* we find no reference to an
express waiver of counsel in any Michigan or Fed-
eral case cited or discussed.

"The order of the Court of Appeals vacating the
plea of guilty is reversed."

Again in *People* v. *Dunn* (1968), 380 Mich 693,
Justice O'HARA writing for the majority said, pp
697–699:

"The first question raised is whether appellee
waived his right to counsel. On his first appearance
before the court he was clearly advised of this right.
He requested that he be brought before the court
again. His purpose in so requesting was determined
by question and answer. There was no necessity
that the court again inform him of his right to
appointed counsel. When he stated to the court that

he desired to plead guilty, after being informed of his right to appointed counsel, he waived that right intelligently and competently. There is no requirement that this waiver be in express form. See *People* v. *Hobdy* (1968), 380 Mich 686.

"The nature of the examination of the accused required by the court rule before the acceptance of a plea of guilty need not be in any stereotyped form.

\*        \*        \*

"But accepting *arguendo* that the precedential language set forth in the brief of appellee is applicable by analogy, we find they hold in principle as follows: Waiver of counsel is impermissible from a silent record. We agree. A right cannot be waived where there is no showing the accused was aware of the right.

"The right when explained thereafter must be understandingly, competently, and intelligently waived.

\*        \*        \*

"We here hold that when a trial judge says, as did Judge Simpson here, 'You understand  \*  \*  \* that you are entitled to an attorney of your own choice and if you are unable to furnish one that the State will furnish you one,' the right to assistance of counsel has been explained, and an offer of counsel made.

"We further hold that after such an explanation, or one of like substance, and the court asks, as here, a question that fairly imports 'What do you want to do?' and the accused replies, in substance, 'I plead guilty,' or 'I desire to plead guilty,' he has within all constitutional rule, statute, and case law requirement, competently, intelligently, and understandingly waived his right to counsel."

Much of the *Miranda* opinion and much of the quotation from it in defendant's brief relates to the nature and existence of the substantive constitu-

tional right to counsel, and not to its waiver. Read
in context, the true import of the sentence, p 470
(86 S Ct at p 1628; 16 L Ed 2d at p 721; 10 ALR3d
at p 1009), "No effective waiver of the right to
counsel during interrogation can be recognized un-
less specifically made after the warnings we here
delineate have been given," is a definition of the
time in the custodial process when the State may
initially claim that waiver has occurred. Clearly,
that time is after the warnings have been given.
The court was saying that the issue of waiver may
not even be raised by the State unless and until
the prerequisite warnings have been given. We do
not construe the quoted sentence as defining the way
in which a valid waiver may occur. That matter
is discussed in a later portion of the opinion begin-
ning at p 473 (86 S Ct at p 1627; 16 L Ed 2d at
p 723; 10 ALR3d at p 1011) with the language "Once
warnings have been given, the subsequent procedure
is clear."

To construe the *Miranda* opinion as requiring a
specific statement that the accused waives his spe-
cific constitutional rights would be inconsistent with
the language from *Miranda* at p 476 (86 S Ct at
p 1629; 16 L Ed 2d at pp 724, 725; 10 ALR3d at
p 1012):

"Whatever the testimony of the authorities as to
waiver of rights by an accused, the fact of lengthy
interrogation or incommunicado incarceration be-
fore a statement is made is strong evidence that the
accused did not validly waive his rights. In these
circumstances the fact that the individual eventually
made a statement is consistent with the conclusion
that the compelling influence of the interrogation
finally forced him to do so. It is inconsistent with
any notion of a voluntary relinquishment of the priv-
ilege. Moreover, any evidence that the accused was
threatened, tricked, or cajoled into a waiver will,

of course, show that the defendant did not voluntarily waive his privilege."

In the instant case the record is barren of any evidence showing that defendant was threatened, tricked, or cajoled; nor was there lengthy interrogation or incommunicado incarceration. Rather, defendant himself initiated the interview with Detective Harkness which resulted in the statement placing defendant at the scene of the crime. Defendant, several hours after receiving the *Miranda* warnings and signing a form card, told the precinct "doorman" that he wanted to see Detective Harkness and defendant was again given the *Miranda* warnings and signed a second form card before making his statement. This record persuades us that defendant did in fact make an intelligent, knowing and voluntary waiver and that the incriminating statement was properly admitted.

Defendant's remaining questions can be answered more briefly. He asserts that his statement is inadmissible for the reason that it was obtained during a prolonged detention prior to arraignment. Defendant was arrested on July 8, 1967 between 5:15 p.m. and 5:30 p.m. He was arraigned on July 10, 1967. He gave the incriminating statement on July 9, 1967 at 3:45 p.m.

In *People* v. *Farmer* (1968), 380 Mich 198, 205 the Court said:

"While this Court has repeatedly condemned the practice of undue detention, the test as to whether such a detention renders a confession involuntary is not the reasonableness of the length of time a person is detained but whether the detention has been used to coerce a confession."

It is clear from the record in this case that defendant's detention was not used to coerce the state-

ment from him and, therefore, it was admissible at trial.

He also alleges that testimony was erroneously introduced that defendant "did not wish to make any statement." Defendant made no objection at the time. On the authority of *People* v. *Webb* (1968), 13 Mich App 625, we find no violation of defendant's rights and, additionally, the issue was not preserved for review.

Defendant's attack on the identification showups on the basis that defendant had no attorney present has not been preserved for review because there was no objection to the in-court identifications. *People* v. *Childers* (1969), 20 Mich App 639.

Defendant also argues that the court erroneously considered his juvenile record in determining the sentence. This argument was considered in *People* v. *Coleman* (1969), 19 Mich App 250, and this Court concluded, p 256:

"The post-conviction examination of juvenile records in order to impose a fair and just sentence is not a use of such records as 'evidence.' "

Other questions posed by defendant have been considered but do not require discussion.

Affirmed.

All concurred.