PEOPLE v McBRIDE

Docket No. 271579. Submitted November 8, 2006, at Detroit. Decided December 19, 2006, at 9:00 a.m.

Mary Ann McBride was charged in the Macomb Circuit Court with open murder in the death of her boyfriend, Robert Adelsburg. McBride, who is deaf and mute, signed a form listing her rights under *Miranda v Arizona*, 384 US 436 (1966), then confessed during a custodial interrogation to stabbing Adelsburg; however, a videotape of the interrogation revealed that McBride claimed to be unfamiliar with *Miranda* rights, the interrogating officer read only portions of the form to McBride and her interpreter, and it was unclear whether McBride was able to read the form she had signed. Although McBride asked during the reading of the form whether she was supposed to have a lawyer, she did not ask explicitly for counsel, and none was provided during the interrogation. McBride moved to suppress evidence of her statements, arguing that she did not knowingly waive her *Miranda* rights and that her right to counsel had been violated. After hearing testimony from a certified interpreter for the deaf who had watched the videotape, the trial court, Peter J. Maceroni, J., issued an order suppressing McBride's statements on the ground that she had not knowingly and intelligently waived her *Miranda* rights, and the prosecutor appealed. The Court of Appeals denied leave to appeal, but the Michigan Supreme Court remanded the case to the Court of Appeals for consideration as on leave granted. 475 Mich 902 (2006).

The Court of Appeals *held*:

1. No specific statement of waiver by McBride was necessary to demonstrate that she waived her *Miranda* rights; her mere act of signing the form was sufficient evidence of such waiver.

2. The trial court did not clearly err in determining that McBride was unable to read and comprehend the form describing her constitutional rights. Neither the officers nor the interpreter inquired into McBride's level of education or understanding of writing or sign language before conducting the interview, and McBride responded by shrugging her shoulders when asked if she could read and write. McBride's interpreter did not have the

opportunity to translate the form itself, and, as a result, McBride received only a word-for-word translation of that portion of the form the officer read aloud. Further, the trial court did not err in concluding that McBride was not fully advised of her constitutional rights in light of the fact that McBride was never told that she had the right to have an attorney present during the interrogation.

3. The trial court erred in concluding that McBride invoked her constitutional right to counsel. The record reflects that McBride merely inquired whether she needed or should have a lawyer, which was not the unequivocal request that would have required the cessation of questioning. However, because the trial court correctly concluded that McBride failed to knowingly and intelligently waive her rights, reversal is not required on this ground.

Affirmed.

1. CRIMINAL LAW — CUSTODIAL INTERROGATIONS — *MIRANDA* RIGHTS — WAIVER.

No specific statement of waiver is required to demonstrate that an accused has waived his or her Fifth Amendment rights; the act of signing a constitutional rights form is sufficient.

2. CRIMINAL LAW — CUSTODIAL INTERROGATIONS — *MIRANDA* RIGHTS — WAIVER — HEARING-IMPAIRED DEFENDANTS.

In cases in which the accused is deaf, a signed constitutional rights form is not an effective waiver if it is unclear whether the accused was capable of reading it and the specific *Miranda* warnings were not adequately explained by an interpreter.

3. CRIMINAL LAW — CUSTODIAL INTERROGATIONS — RIGHT TO COUNSEL — INVOCATION.

A suspect's general inquiries whether counsel should be present during a custodial interrogation are not sufficient to invoke the constitutional right to counsel.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *Eric J. Smith*, Prosecuting Attorney, *Robert Berlin*, Chief Appellate Attorney, and *Joshua D. Abbott*, Assistant Prosecuting Attorney, for the people.

*Robert C. Buschmohle* for the defendant.

Before: WHITBECK, C.J., and SAWYER and JANSEN, JJ.

PER CURIAM. The prosecution appeals, as on leave granted after remand from the Michigan Supreme Court, the trial court's order suppressing inculpatory statements made by defendant Mary Ann McBride during an interview with the police. We affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

McBride was arrested and charged with open murder[1] in the death of her boyfriend, Robert Adelsburg. Adelsburg died of multiple stab wounds on April 22, 2005, at the couple's shared residence in Roseville. Adelsburg was found in a pool of blood in the basement of the house. McBride was arrested at approximately 11:00 p.m. on April 22, 2005, and transported to a hospital for treatment of self-inflicted injuries from an unsuccessful suicide attempt. Sometime thereafter, McBride was taken to the Roseville Police Department.

After learning that McBride was deaf and mute, the officer in charge of the case, Detective Sergeant Jon Sarrach, called Sign Language Services of Michigan to inquire about an interpreter. Stacey Yourdan arrived at the police station to serve as the interpreter during the interview of McBride. According to Detective Michael Demick, neither he nor Detective Sarrach attempted to speak with McBride before the interpreter arrived. At approximately 6:30 a.m., Detective Sarrach retrieved McBride from her cell and placed her in the interrogation room. McBride was seated at a table, facing a video camera mounted above the door. Yourdan was seated across the table from McBride with her back to the camera. Because of the angle of the camera, the videotape of the interrogation does not show many of Yourdan's signs to McBride. Detectives Demick and Sarrach

---

[1] MCL 750.316.

were seated opposite each other on the other two sides of the table.

Detective Demick testified that, during the interrogation and the reading of a constitutional rights form, Yourdan was signing to McBride and mouthing the words as she interpreted. According to Detective Demick, McBride looked at Detective Sarrach while he was speaking and then would look at Yourdan as she signed for her. Detective Demick stated that he watched both Detective Sarrach and McBride during these exchanges. Detective Demick testified that McBride would sometimes nod her head side-to-side or up and down during the interview to indicate a negative or affirmative response, respectively, to Detective Sarrach's questions. Often, Yourdan did not verbalize McBride's head movements.

Detective Sarrach started the interview by stating that everyone the police talk to are advised of "their rights" and then asking McBride if she had "ever heard of *Miranda*."[2] McBride shook her head side-to-side, and Yourdan interpreted this as a negative response. Detective Sarrach then inquired whether McBride watched television, to which McBride nodded her head up and down. Yourdan interpreted this as a "yes." Detective Sarrach then asked if McBride had ever seen a law program on television. McBride again shook her head side-to-side, which Yourdan interpreted as a negative response. Detective Sarrach stated, "I bet you as soon as I tell you about 'em, you'll say 'yeah, I know what they are.' "

Detective Sarrach then asked McBride if she could read and write. And, according to Detective Demick's testimony, McBride "said yes." However, the videotape

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

shows that after Detective Sarrach asked McBride if she could read and write, McBride responded with a shrug of her shoulders, which Yourdan interpreted as an affirmative response. Detective Sarrach then stated, "I'm gonna give you a sheet of paper, and you can follow along with me, if you want." The paper to which Detective Sarrach referred was a constitutional rights form. Detective Sarrach placed the constitutional rights form on the table between himself and McBride, so that McBride was able to see it and presumably follow along as Detective Sarrach read each right. However, Detective Demick testified that McBride was unable to simultaneously read the form and follow Yourdan's signs as Detective Sarrach spoke.

At the top of the constitutional rights form is a stationery header for the City of Roseville Police Department. The document is then titled, followed by a list of five separate rights. At the bottom of the page there are signature lines for two witnesses and the advisee, as well as blank lines on which to indicate a date and time. Specifically, the form states as follows:

ROSEVILLE POLICE DEPARTMENT

CONSTITUTIONAL RIGHTS

CERTIFICATE OF NOTIFICATION

You understand that:

1. You have a right to remain silent and that you do not have to answer any questions put to you or make any statements.

2. Any statement that you make or anything you say can and will be used against you in a Court of Law.

3. You have the right to have an attorney (lawyer) present before and during the time you answer any questions or make any statements.

4. If you cannot afford an attorney (lawyer), one will be appointed for you without cost by the Court prior to any questioning.

5. You can decide at any time to exercise your rights and not answer any questions or make any statement.

I understand that these are my rights under the law.

Detective Demick testified that the purpose of the form was "[t]o make sure that we notify people who are under arrest who need to be told of their Miranda rights and to have them sign it to make sure that they acknowledge that they were informed of all of their rights."

Detective Sarrach began to read the constitutional rights form to McBride but combined the first part of the first right with the second part of the second right, stating specifically, "It says, 'You have the right to remain silent and anything you say can and will be used against you in a court of law.'" Notably, Detective Sarrach left off the second clause of the first right: "that you do not have to answer any questions put to you or make any statements." Detective Sarrach then asked McBride, "You understand that?" McBride nodded her head up and down, and Yourdan interpreted this as an affirmative response. However, using sign language for the first time during the interview, McBride immediately then inquired either, "No, wait, am I supposed to have a lawyer?" or "Do I need a lawyer?" Detective Sarrach responded, "Well, you have a right to *have* one." McBride nodded her head up and down. But Yourdan did not verbalize this response. Detective Sarrach did not respond to McBride's head nod, and McBride did not ask any further questions or attempt to make any statements regarding an attorney.

Detective Sarrach then continued with the rights form and read verbatim the second right listed on the

form. Detective Sarrach skipped the third right listed on the form regarding her right to the presence of an attorney. Detective Sarrach then read the first half of the fourth right listed on the form but failed to tell McBride that an attorney could be appointed for her "without cost by the Court prior to any questioning." Detective Sarrach asked again, "You understand that?", and McBride responded with an up and down head movement. However, Yourdan did not verbalize this response. Detective Sarrach continued with the final right listed on the form but left off that McBride could, at any time, decide not to "answer any questions or make any statement."

After reading the constitutional rights form to McBride, Detective Sarrach again questioned McBride regarding whether she had heard the *Miranda* rights before. McBride shook her head side-to-side, and Yourdan interpreted this as a "no." Detective Sarrach then placed the form in front of McBride, stating, "I'm gonna ask you to sign that, showing that I read you this and gave you an opportunity . . . ." McBride interrupted Detective Sarrach, inquiring about the time of day and commenting that she had not slept for long. Detective Sarrach then directed McBride "to sign right at that X," pointing to the form. McBride appeared to pause and read the form, and then she signed her name at the bottom. Detectives Sarrach and Demick signed on the witness lines. Yourdan was never given the opportunity before or during the interview to review the form or to interpret the omitted portions of each right that Detective Sarrach failed to read. Further, Detective Sarrach did not tell McBride that by signing the form she would be waiving her rights.

After asking some preliminary questions, Detective Sarrach asked McBride, "Do you know why you're

here?" McBride nodded up and down, and Yourdan interpreted this as an affirmative response. Detective Sarrach then asked McBride if she wanted to tell him why she was there, and she shook her head side-to-side while shrinking away from the table. Yourdan did not verbalize this response. But Detective Sarrach immediately continued to question McBride, and during the interview that followed, McBride confessed to stabbing Adelsburg while he was sleeping.

McBride moved to suppress evidence of her statements to the police, arguing that she did not knowingly waive her rights and that, by ignoring her request for counsel before she gave her statement, the officers violated her constitutional right to counsel. During the *Walker*[3] hearing that followed, Yvonne Jones testified on behalf of McBride regarding deaf culture and the interpreting process. According to Jones, who is certified as a National Association for the Deaf level-four interpreter, American Sign Language (ASL) is a conceptual language.[4] This means that, when communicating with ASL, an interpreter does not sign "word-for-word" what the speaker is saying; instead, the interpreter will attempt to sign the "concept" of what is being spoken. According to Jones, if an interpreter signs each word in a written sentence, the deaf person will focus on the individual word and miss the meaning of the sentence. Jones explained, "If you just sign every word that person says, that's not ASL. That's not interpreting, that's translating."

Jones testified that a deaf individual's understanding level, education, and background can influence the way

---

[3] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

[4] We note that defense counsel conceded at oral argument that ASL, as a conceptual language, provides an appropriate mode of communication by which *Miranda* rights may be conveyed.

an interpreter signs. Jones further opined that a deaf person might nod up and down in response to a statement for several different reasons, including to convey agreement with what the speaker is saying, to convey understanding of what the speaker is saying, to simply acknowledge or recognize that the statement was made, or to give the appearance of following along so that he or she does not "look less intelligent." Jones also testified that deaf people do not generally view the police in a positive light and will usually follow along with police requests because of their status as authority figures.

On the basis of her review of the interrogation videotape, Jones concluded that Yourdan was often merely translating word-for-word and not interpreting the concepts of what Detective Sarrach was saying when he read from the constitutional rights form. Jones "noticed that [the] interpreter a lot of times would sign exactly the words that were being said. But what is meant by what is being said is not signed. So all that the client is receiving is a bunch of words." Jones explained that when statements are translated like this, the deaf person might understand a little bit from piecing the words together, but he or she is left to guess and assume a lot about what is being said.

After arguments by both parties, the trial court took the decision under advisement. However, the trial court stated that it was "curious" that Detective Sarrach left off portions of each right and that he made McBride sign the form without first receiving acknowledgment that McBride understood it.

After considering the motion, the trial court issued its order suppressing McBride's statements to the police. After highlighting the fact that McBride was clearly in custody at the time of her statements, the

trial court concluded that McBride did not knowingly and intelligently waive her *Miranda* rights. The trial court explained, referring to the videotape:

> [McBride] had signed at the outset "do I need a lawyer?" and "aren't I supposed to have a lawyer?", to which Det. Sarrach stated "well, you have a right to *have* one . . ." (emphasis in original), and proceeded to show [McBride] the advice of rights (form) used by the Roseville Police Department.
>
> Notably, while Det. Sarrach is showing [McBride] the form, [McBride]—again, a deaf mute—is watching either the interpreter or Det. Sarrach's face, presumably in an attempt to read lips, in order to understand what is being said. Despite [McBride]'s specific request for an attorney, Det. Sarrach fails to verbally enumerate that portion of the form specifically pertaining thereto; namely item 3 . . . .

* * *

> Det. Sarrach also failed to fully read item 5, stating only the portion relating to [McBride]'s ability to decide at any time to exercise her rights (oddly, without fully informing her of just what rights she was capable of exercising), and specifically *failing* to advise that she had the ability not to answer any questions or make any statement whatsoever. He then directed her to sign the document[5], which she did, proceeding to give the statements that are the subject herein.

---

[5] Det. Sarrach affirmatively states "I'm gonna ask you to sign right here . . .", thereby taking on the nomenclature of a directive rather than a request, portraying it as *pro forma* in nature; of no consequence.

---

It appears to the Court that [McBride] clearly failed to grasp Det. Sarrach's admonition pertaining to her ability to have counsel present then and there, as opposed to merely being an option that was prospective in nature (i.e., at trial).

The trial court then restated the fact that McBride twice denied that she had seen a television show involving *Miranda* warnings and concluded that McBride did not know that she could have an attorney present during the interrogation or refuse to answer questions. The trial court found significant that McBride specifically questioned Detective Sarrach, asking, "shouldn't I have a lawyer?", because it indicated that McBride was under the assumption that she should, in fact, have had a lawyer. And, according to the trial court, all questioning should have ceased at that time. The trial court further found it notable that McBride did not, "either through sign or body language," indicate an affirmative response to the question whether she could read and write; indeed, she simply shrugged her shoulders. Finally, the trial court pointed out that Detective Sarrach's recitation of the constitutional rights was incomplete and, in light of McBride's inability to hear and apparent inability to comprehend the written form, suppressed McBride's statements.

The prosecution moved to stay McBride's trial pending resolution of this matter on appeal, but the trial court denied the prosecution's motion. The prosecution then filed an application for leave to appeal in this Court, simultaneously moving to stay the lower court proceedings and for immediate consideration. This Court granted the prosecution's motion for immediate consideration, but denied its application for leave to appeal for failure to persuade this Court of the need for immediate appellate review.[5] The prosecution then filed an application for leave to appeal in the Michigan Supreme Court, a motion for immediate consideration, and a motion to stay the lower court proceedings.

---

[5] *People v McBride*, unpublished order of the Court of Appeals, entered June 27, 2006 (Docket No. 269376).

Pursuant to MCR 7.302(G)(1), in lieu of granting leave to appeal, the Supreme Court remanded the case to this Court for consideration as on leave granted. The Supreme Court also granted the prosecution's motion for a stay of the lower court proceedings.[6]

## II. MOTION TO SUPPRESS

### A. STANDARD OF REVIEW

The prosecution argues that the trial court clearly erred in concluding that McBride did not knowingly and intelligently waive her constitutional rights. We review de novo the trial court's ultimate decision on a motion to suppress.[7] However, we "will not disturb a trial court's factual findings with respect to a *Walker* hearing unless those findings are clearly erroneous."[8] A factual finding is clearly erroneous if the appellate court is left with a definite and firm conviction that a mistake has been made, giving due deference to the trial court's superior ability to determine credibility.[9]

### B. WAIVER OF FIFTH AMENDMENT RIGHTS

"A statement obtained from a defendant during a custodial interrogation is admissible only if the defendant voluntarily, knowingly, and intelligently waived his Fifth Amendment rights."[10] The United States Supreme Court in *Miranda* described the now-familiar "procedural safeguards" that are required when an individual is in custody:

---

[6] *People v McBride*, 475 Mich 902; 716 NW2d 586 (2006).

[7] *People v Akins*, 259 Mich App 545, 563; 675 NW2d 863 (2003).

[8] *Id.*

[9] *People v Sexton (After Remand)*, 461 Mich 746, 752; 609 NW2d 822 (2000).

[10] *Akins, supra* at 564.

He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation.[11]

"[T]he prosecution has the burden of establishing a valid waiver by a preponderance of the evidence."[12]

### (1) CUSTODY

Neither party on appeal challenges the trial court's conclusions that McBride was in custody at the time she made the statements and that the police did not coerce McBride into making the statements. Accordingly, we will limit our discussion to whether the trial court properly determined that the prosecutor failed to show by a preponderance of the evidence that McBride made a knowing and intelligent waiver of her constitutional rights.

### (2) SPECIFIC STATEMENT OF WAIVER

Before we consider whether there was a knowing and intelligent waiver in this case, we consider the seemingly logical precursor to that question: Was there a waiver at all? As McBride points out, she was instructed to sign the constitutional rights form without any indication or explanation that signing the form constituted her agreement to waive the rights that it contained. Notably, there is no language on the form that indicates that signing it equates to a waiver. As quoted above, on its face the form is intended simply to provide

---

[11] *Miranda, supra* at 479.

[12] *People v Daoud*, 462 Mich 621, 634; 614 NW2d 152 (2000).

documentation that the defendant understood the delineated rights. And, as mentioned, Detective Demick testified that the purpose of the form was "[t]o make sure that we notify people who are under arrest who need to be told of their Miranda rights and to have them sign it to make sure that they acknowledge that they were informed of all of their rights." Thus, there is no indication in the record or from the language of the form that it was intended to serve as evidence of a waiver. Further, apart from the plain language of the form, neither detective present during McBride's interview asked her whether she was in fact waiving her rights before they proceeded with the interview. The relevant question therefore is whether, absent express assent to waive her rights, McBride effected a waiver at all in this case, let alone made such a waiver knowingly and intelligently.

In *People v Matthews*, this Court considered, as a matter of first impression, the defendant's argument that, even after being advised of his rights, his failure to *specifically* waive his right to counsel barred the admission at trial of statements he made during his custodial interrogation.[13] The prosecution denied that a defendant's specific waiver of in-custody constitutional rights was required for a confession or statement to be admissible at trial. This Court noted that the *Miranda* opinion did contain support for the defendant's argument.[14] But this Court further noted that the prosecution's position, "that there can be a waiver without the use of specific or magic words," was supported in a

---

[13] *People v Matthews*, 22 Mich App 619, 624; 178 NW2d 94 (1970).

[14] *Id.* at 624-625, citing *Miranda, supra* at 470 ("No effective waiver of the right to counsel during interrogation can be recognized *unless specifically made* after the warnings we here delineate have been given." [Emphasis added.]).

number of jurisdictions.[15] This Court then quoted approvingly the following statement from the United States Court of Appeals for the Fourth Circuit:

> "[W]e cannot accept appellant's suggestion that because he did not make a statement—written or oral—that he fully understood and voluntarily waived his rights after admittedly receiving the appropriate warnings, his subsequent answers were automatically rendered inadmissible. Of course, the attendant facts must show clearly and convincingly that he did relinquish his constitutional rights knowingly, intelligently and voluntarily, but *a statement by the defendant to that effect is not an essential link in the chain of proof.*"[16]

This Court then interpreted *Miranda*'s statement, "No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we here delineate have been given,"[17] as simply providing "a definition of the time in the custodial process when the State may initially claim that waiver has occurred," rather than as "defining the way in which a valid waiver may occur."[18] This Court stated that "[t]o construe the *Miranda* opinion as requiring a specific statement that the accused waives his specific constitutional rights would be inconsistent with the language from *Miranda*" indicating that " '[w]hatever the testimony of the authorities as to waiver of rights by an accused,' " the focal point of the court's inquiry should be on the intelligent, knowing, and voluntary nature of the waiver.[19]

---

[15] *Matthews, supra* at 626-627.

[16] *Id.* at 627, quoting *United States v Hayes*, 385 F2d 375, 377-378 (CA 4, 1967) (emphasis added).

[17] *Miranda, supra* at 470.

[18] *Matthews, supra* at 630.

[19] *Id.* at 630-631, quoting *Miranda, supra* at 476.

Subsequent decisions of this Court have followed *Matthews*, holding that "no express waiver is required after an accused had been advised of his rights."[20] Indeed, in *People v Wimbush*, this Court relied on *Matthews* to specifically conclude that the act of signing a constitutional rights form after such form was read to and by the defendant was sufficient to "constitute the type of waiver required by the *Miranda* decision."[21] Accordingly, we conclude that no specific statement of waiver by McBride was necessary to demonstrate that she waived her Fifth Amendment rights. Rather, her mere act of signing the form was sufficient evidence of such waiver.

### (3) KNOWING AND INTELLIGENT WAIVER

Having concluded that McBride need not have made a specific statement of waiver and that, in fact, her waiver was evidenced by her signing of the constitutional rights form, we must still consider the intelligent and knowing nature of that waiver.[22]

"Whether a suspect has knowingly and intelligently waived his *Miranda* rights depends in each case on the totality of the circumstances, including the defendant's intelligence and capacity to understand the warnings given."[23] "[T]his can only be done by examining the objective circumstances surrounding the waiver."[24]

---

[20] *People v McClendon*, 48 Mich App 552, 556; 210 NW2d 778 (1973); see also *People v Mann*, 49 Mich App 454, 462; 212 NW2d 282 (1973) (stating that a defendant's "affirmative response that he understood the rights given him on its face constitutes a waiver of his right against self-incrimination"); *People v McClure*, 29 Mich App 361, 368; 185 NW2d 426 (1971).

[21] *People v Wimbush*, 45 Mich App 42, 44-45; 205 NW2d 890 (1973).

[22] See *Matthews, supra* at 630-631.

[23] *People v Howard*, 226 Mich App 528, 538; 575 NW2d 16 (1997).

[24] *Daoud, supra* at 634.

" 'To waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail.' "[25] Although "[t]o knowingly waive *Miranda* rights, a suspect need not understand the ramifications and consequences of choosing to waive or exercise the rights,"[26] the state must present evidence sufficient to demonstrate that the defendant understood that he or she did not have to speak and that he or she had the right to the presence of counsel during questioning.[27]

In *People v Brannon*, this Court addressed the appropriate standard to be used when considering the admissibility of a deaf defendant's statements during an interrogation:

> Before utilizing a statement made by a hearing-impaired defendant either with or without the assistance of an interpreter, it must be established that the defendant comprehended his *Miranda* rights and intelligently waived them before making the statement. A waiver is intelligently made when the *Miranda* warnings are explained to the defendant by an interpreter familiar with and competent in the defendant's primary language.[28]

The *Brannon* Court noted that "[t]he use of a written form becomes more palatable in a case involving a defendant who is hearing-impaired."[29]

In *Brannon*, the "hearing-impaired" defendant[30] "did not appear to have a problem understanding the offic-

---

[25] *Id.* at 640, quoting *In re WC*, 167 Ill 2d 307, 328; 212 Ill Dec 563; 657 NE2d 908 (1995).

[26] *People v Cheatham*, 453 Mich 1, 28; 551 NW2d 355 (1996).

[27] *Miranda, supra* at 470-471; *Daoud, supra* at 637.

[28] *People v Brannon*, 194 Mich App 121, 130-131; 486 NW2d 83 (1992) (citations omitted).

[29] *Id.* at 130.

[30] There was some question regarding the defendant's hearing ability. *Id.* at 128. However, the defendant "still relied on visual cues to receive communications," and "was believed to be proficient at lip reading." *Id.*

ers, although some statements had to be repeated, and [the] defendant gave appropriate responses to all questions he was asked."[31] Further, the police used a written advice-of-rights form and made other efforts to ensure that the defendant could hear and understand, even though an interpreter was not used.[32] This Court held that, under the totality of the circumstances, the defendant made a knowing and intelligent waiver.[33]

In support of its position that McBride knowingly and intelligently waived her *Miranda* rights, the prosecution relies on *People v Truong*.[34] In *Truong*, the defendant, whose primary language was Vietnamese, was provided a translator, who translated the *Miranda* rights "word-for-word instead of trying to explain them."[35] Further, the defendant admitted that he "understood the words used in translating the rights, told the police that he understood the rights, signed and initialed the waiver form, did not request any clarification, and responded in a logical manner to the subsequent questioning by the police."[36] This Court therefore held that the defendant had the requisite level of understanding of, and validly waived, his constitutional rights.[37] This Court noted that "a person speaking to the police through a translator is subject to the same standards as a person fluent in English."[38] According to this Court, "There is no greater obligation on the part

[31] *Id.* at 129.

[32] *Id.* at 128-129.

[33] *Id.* at 131.

[34] *People v Truong (After Remand)*, 218 Mich App 325; 553 NW2d 692 (1996).

[35] *Id.* at 334.

[36] *Id.* at 335.

[37] *Id.*

[38] *Id.*

of the police to ascertain comprehension of *Miranda* rights with respect to a person using a translator than with respect to a person fluent in English."[39]

Despite the prosecution's attempt to draw a parallel between situations involving sign language interpreters and situations involving non-English speaking persons using a translator, we find *Brannon* more applicable to the present facts. Therefore, examining the totality of the circumstances, we must determine whether McBride comprehended her *Miranda* rights as conveyed by the interpreter and intelligently waived them.

Neither Detective Demick nor Detective Sarrach inquired into McBride's level of education or understanding before conducting the interview. The record also shows that the interpreter failed to speak with McBride before or during the interview about her level of education or understanding in regard to McBride's ability to sign. Thus, neither the detectives nor the interpreter assessed whether McBride would be able to understand her rights. Moreover, there is no indication in the record that McBride understood all the rights as translated to her. As Jones testified, Yourdan was "a lot of times" merely translating Detective Sarrach's statements word-for-word, such that what was meant by what was being said was not signed. So, according to Jones, all that McBride was receiving was "a bunch of words." Further, the record reveals that, both before and after portions of the constitutional rights form were read, McBride indicated that she did not understand what *Miranda* rights were. Therefore, we conclude that it is unclear from the record whether McBride adequately comprehended her *Miranda* rights as they were explained to her.[40]

---

[39] *Id.*

[40] See *Brannon, supra.*

Both *Brannon* and *Truong* recognized the importance of providing non-English speaking defendants a written form outlining their constitutional rights. And the record here indicates that after the form was placed before her, McBride paused and appeared to read it before she signed it. However, the use of a written form was inadequate in light of McBride's noncommittal response regarding whether she could read and comprehend the constitutional rights form, and in light of the police officers' failure to further question McBride regarding her limitations.

Detective Demick testified that McBride "said yes" when asked if she could read and write, and that she appeared to read the form just before she signed it. However, the videotape shows otherwise. McBride is asked whether she can read or write, and she responds with a shrug of her shoulders. Nonetheless, Yourdan interprets McBride's gesture as an affirmative response even though McBride's hands remained in her lap. In *Daoud*, the Michigan Supreme Court noted that " '[c]redibility is crucial in determining a defendant's level of comprehension, and the trial judge is in the best position to make this assessment.' "[41] Thus, on the basis of the lower court record and notwithstanding Detective Demick's testimony, this Court cannot conclude that the trial court clearly erred in determining that McBride was unable to read and comprehend the form. More importantly, the record shows that Yourdan was not given the opportunity to translate the form itself for McBride. Thus, McBride could not have made an intelligent waiver because the specific *Miranda* warnings were not adequately explained to her by an interpreter.[42]

---

[41] *Daoud, supra* at 629, quoting *Cheatham, supra* at 30.

[42] *Brannon, supra* at 131.

We further conclude that the trial court did not clearly err in holding that McBride was not fully advised of her constitutional rights. First, the record shows that Detective Sarrach failed to inform McBride that she had the right to the presence of an attorney *during the questioning*.[43] Sarrach only told defendant that she had a "right to have one" in response to her questioning regarding counsel. We agree with the trial court that Detective Sarrach's explanation of the *Miranda* rights was constitutionally inadequate to inform McBride of her right "to have counsel present then and there, as opposed to merely being an option that was prospective in nature (i.e., at trial)." Viewing the totality of the circumstances, we conclude that the trial court did not clearly err in holding that McBride was not fully informed of, or did not fully understand, her right to counsel during the interrogation.

C. REQUEST FOR COUNSEL

In its opinion and order, the trial court concluded that McBride's inquiry, " 'shouldn't I have a lawyer?' ", demonstrated "that she was indeed operating under the presumption that she *should*, thereby requiring the immediate cessation of all questioning."[44] In this respect, we believe that the trial court erred.

A criminal defendant has a constitutional right to counsel during interrogation. *Miranda, supra* at 444-445. When a defendant invokes his right to counsel, the police must terminate their interrogation immediately and may not resume questioning until such counsel arrives. *Edwards v Arizona*, 451 US 477, 482; 101 S Ct 1880; 68 L Ed 2d 378 (1981). However, the defendant's invocation of his right to counsel must be unequivocal. *Davis v United States*, 512

[43] *Miranda, supra* at 479.

[44] Emphasis in original.

US 452, 457; 114 S Ct 2350; 129 L Ed 2d 362 (1994). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* at 459.[45]

Thus, statements like "Maybe I should talk to an attorney," or "I might want to talk to an attorney," are insufficient to invoke a defendant's right to counsel and end questioning.[46]

Here, after Detective Sarrach read the first right from the form to McBride, she inquired whether she needed or should have a lawyer. We conclude that these inquiries were insufficient to show that McBride properly invoked her constitutional right to counsel. These inquiries were simply that, inquiries, not unequivocal demands for counsel. However, we need not reverse the trial court on this ground in light of our agreement with the trial court's ultimate conclusion that McBride failed to knowingly and intelligently waive her rights.[47]

### III. CONCLUSION

Although we conclude that it was not necessary for McBride to specifically waive her rights and that her inquiry regarding counsel did not require the cessation of questioning, we conclude that no clear error existed in the trial court's decision that McBride did not knowingly and voluntarily waive her constitutional rights.

Affirmed.

---

[45] *People v Tierney*, 266 Mich App 687, 710-711; 703 NW2d 204 (2005).

[46] *Id.* at 711.

[47] See *Tipton v William Beaumont Hosp*, 266 Mich App 27, 37-38; 697 NW2d 552 (2005).