# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

KENNETH DAWAYNE HILL,

      Defendant-Appellant.

UNPUBLISHED
February 9, 2017

No. 329166
Macomb Circuit Court
LC No. 2014-002440-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

JOMAR DAVELL ROBINSON,

      Defendant-Appellant.

No. 329209
Macomb Circuit Court
LC No. 2014-002441-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

DARIUS ARAMOND DIAZ-GASKIN,

      Defendant-Appellant.

No. 329223
Macomb Circuit Court
LC No. 2014-002438-FC

---

Before: WILDER, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

In this matter involving the armed robbery of a convenience store, defendants Kenneth Dawayne Hill, Jomar Davell Robinson, and Darius Aramond Diaz-Gaskin appeal as of right from their respective jury trial convictions of one count each of (1) felony murder, MCL

750.316(1)(b), (2) armed robbery, MCL 750.529, (3) possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, and (4) conspiracy to commit armed robbery, MCL 750.157a; MCL 750.529.[1] We affirm.

## I. FACTUAL BACKGROUND

This case arises out of a fatal shooting that occurred during an armed robbery at a Clinton Township convenience store. The 51-year-old victim was the storeowner. All three defendants eventually confessed to their involvement in the robbery.

Before the robbery, defendants gathered at Hill's apartment, then proceeded to the store in Hill's car. The store's surveillance footage showed three individuals—later identified as Grayson, Robinson, and Diaz-Gaskin—enter the store wearing dark clothing, gloves, and masks. The masked men placed "a block in the door to stop the door from locking behind them," presumably to defeat a push-button security device used by some stores that locks intruders inside when an alarm button is pressed. The first two men to enter the store were wielding firearms before they entered. The third masked man, Robinson, removed a red bag from under his shirt and appeared to be unarmed.

The victim emerged from a rear office area, and Diaz-Gaskin jumped onto the countertop, began to "track[]" the victim with the muzzle of his handgun, and fired a single round, which struck the victim. The gunshot wound was necessarily fatal.[2]

After he was shot, the victim fell to the ground, and Diaz-Gaskin subsequently aimed his semi-automatic handgun down at the victim's prone body. Due to a malfunction, however, Diaz-Gaskin's weapon could not be fired again immediately. Robinson removed money from the cash register, depositing it in the bag he carried, and the masked men fled. A passerby, who noticed the men fleeing the store, promptly called the police and reported the incident as a suspected robbery. A responding officer discovered the victim dead on the floor of the store.

According to Detective Dan Quinn of the Clinton Township Police Department, the police originally had little information about the masked men, and thus had no initial suspects. But the police ultimately received 74 "tips" regarding the robbery, several of which implicated defendants. After investigating and surveilling defendants, the police became convinced that Grayson and defendants were the perpetrators of the robbery, and all four suspects were arrested.

After obtaining *Miranda*[3] waivers, Detective Quinn and Detective Brian Gilbert performed a custodial interrogation of each of the four suspects. Defendants all initially denied any involvement in the robbery, but each subsequently confessed to his role.

---

[1] Defendants' former codefendant, Clinton Rayshawn Grayson, was tried separately.

[2] The bullet fractured several of the victim's ribs; punctured his left lung, causing it to collapse; traversed through his pericardium; struck his heart, lacerating several valves and arteries; and severed his ascending aorta.

Robinson stated that he was unarmed during the robbery, and "didn't see the guns" carried by Grayson and Diaz-Gaskin. But Robinson acknowledged that he "knew" Grayson and Diaz-Gaskin were armed before the robbery occurred.

Diaz-Gaskin denied that he had intended to shoot the victim, claiming that his handgun had accidentally discharged. Diaz-Gaskin stated that he "thought he had the safety" of that weapon engaged and believed that his finger was not on the trigger, but when he "went to strike the victim" with the gun, it accidentally discharged. Contrastingly, based on the fact that Diaz-Gaskin "tracked" the victim with the muzzle of the semi-automatic handgun before firing, Detective Quinn opined that the shooting was not accidental but was, rather, a deliberate act. Diaz-Gaskin admitted that he was in possession of the semiautomatic handgun at Hill's apartment before the robbery and in Hill's car on the drive to the robbery. Diaz-Gaskin also penned a confession letter, expressing his remorse.

Hill provided the police with both a written confession of his involvement as the driver and an oral confession.

Defendants were subsequently convicted and sentenced as previously set forth. Their instant appeals ensued.

## II. STANDARDS OF REVIEW

The arguments raised by defendants on appeal implicate varying standards of review. A trial court's ultimate ruling on a motion to suppress is reviewed de novo, *People v Tierney*, 266 Mich App 687, 703; 703 NW2d 204 (2005), while the trial court's related factual findings are reviewed for clear error, with due deference paid to the trial court's assessments of evidentiary weight and witness credibility, *People v Shipley*, 256 Mich App 367, 373; 662 NW2d 856 (2003). "A finding is clearly erroneous if it leaves this Court with a definite and firm conviction that a mistake was made." *Id.*

On the other hand, "[c]laims of prosecutorial misconduct are generally reviewed de novo to determine whether the defendant was denied a fair trial." *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013). We also review de novo "[a] challenge to the sufficiency of the evidence in a jury trial . . . ." *People v Gaines*, 306 Mich App 289, 296; 856 NW2d 222 (2014). The evidence is viewed in the "light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *People v Robinson*, 475 Mich 1, 5; 715 NW2d 44 (2006).

> The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict. The scope of review is the same whether the evidence is direct or circumstantial. Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime. [*People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000) (quotation marks and citation omitted).]

---

[3] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

"It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

"This Court reviews for an abuse of discretion a trial court's decision regarding the severance of trials when multiple defendants are involved." *People v Bosca*, 310 Mich App 1, 43; 871 NW2d 307 (2015). "A trial court abuses its discretion when it chooses an outcome that is outside the range of principled outcomes." *Id.*

Unpreserved issues regarding jury selection are reviewed for plain error affecting the defendant's substantial rights, *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530 (2007), as are unpreserved claims of instructional error, *People v Alter*, 255 Mich App 194, 204; 659 NW2d 667 (2003). "To establish plain error requiring reversal, a defendant must demonstrate that 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id.* (quotation marks and citation omitted). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Further, even if a defendant

> satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*Id.* at 763-764 (quotation marks, citation, and brackets omitted).]

By contrast, "[u]npreserved issues concerning ineffective assistance of counsel are reviewed for errors apparent on the record." *People v Lockett*, 295 Mich App 165, 186; 814 NW2d 295 (2012). "Whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012).

III. ANALYSIS

Each defendant raises several claims of error on appeal. We address each in turn.

A. DOCKET NO. 329166

1. VOLUNTARINESS OF CONFESSIONS

Before his custodial interrogation, Hill was advised of his *Miranda* rights, and he signed a written *Miranda* waiver. When asked whether he was "familiar" with his *Miranda* rights, Hill responded, "Yes, sir." During the ensuing interrogation, the following exchange occurred:

> *[Detective Gilbert]*: [Grayson]'s the only person you know. . . . I'm going to talk to everybody, [Hill]. I hope you understand this.

*[Hill]*:  Can I get a lawyer because I am defending myself[?]  I need to fight for myself.  I'm not fighting for nobody else because (inaudible) you know.

I have two little girls and I have to look after, you know what I'm saying?  This is too tough.  It is tough, it is tough.

*[Detective Gilbert]*:  Are you --

Okay.  Yes, you have a right to a lawyer.  Okay.  Just like we went over in the very beginning, and just like we explained to you.  We want to give you the opportunity to talk to us.  Okay.  You have a right to a lawyer.  If you want a lawyer, that is fine.  Then we're going to stop talking to you.  Then you're not going to have an opportunity to talk to us any more.  I want you to understand that because we're going to talk to everybody else.  We may not come back and talk to you.

This is your opportunity right now.  And I've been very straight forward and very honest with you.  You do have that right, but once the door is shut, then we won't probably come back and talk to you and we will be talking to everybody else then --

*[Hill]*:  I still have a lawyer to talk to, right[?]

*[Detective Quinn]*:  That is not going to happen.

*[Detective Gilbert]*:  That is not going to happen.

*[Hill]*:  Say what, sir[?]

*[Detective Quinn]*:  That is not going to happen.

*[Detective Gilbert]*:  That is not going to happen because right now is when I want you to be truthful with me.

I know the truth, and you're beating around the bush.

And with you asking for a lawyer, I'm just telling you that we are going to talk to everybody.  And this is your only opportunity to talk to us.  Okay.

You are the least culpable in this.  Okay.  I know that.

Let me explain to you.  I know you drove that night.  I know which way you went back.  I know you came off Joy Road and came down, and drove past the guard shack.

I have pictures of you going into the apartment buildings.  I have your keys being used to go into the apartment building.

I have you in your car starting the car up, prior to this.

-5-

*[Detective Quinn]*: With these guys in (inaudible).

*[Detective Gilbert]*: With these guys in your car. With these guys coming out of your apartment leaving the apartment building. I have all that. I have witnesses. I have enhancement of pictures of these. That is not the best picture, that is the worst picture. Okay.

You have kids and I'm giving you the opportunity to talk to me now about it. Okay. I'm going to talk to everybody.

*[Hill]*: That is fine but.

*[Detective Gilbert]*: And guess what, somebody is going to talk about it.

*[Hill]*: Say what, sir[?]

*[Detective Quinn]*: Somebody is going to talk about it. Because one person pulled the trigger, not four. You understand that.

*[Hill]*: I understand you, sir.

*[Detective Gilbert]*: Okay. Now, I guess --

*[Detective Quinn]*: We need to know, [Hill], before we go any further. You know, you have the right to have an attorney. I just want to make it clear. Okay. You understand what [Detective Gilbert] said. You have a right to an attorney.

So before we continue talking we need to know. Do you want an attorney or do you want to tell us your side of the story[?]

*[Hill]*: I want an attorney.

*[Detective Gilbert]*: You want an attorney. Okay. That is it, man. Good luck to you.

Roughly 20 minutes later, however, Hill contacted the detectives and indicated that he wished to give a statement:

*[Detective Quinn]*: All right. We just left here, right, because you said you wanted an attorney, right?

Come on in.

Right? Is that correct? You said you wanted an attorney and I stopped talking and I haven't asked you any questions. Right[?] Is that correct[?]

Okay. We took you back to booking, right, to the booking, the cells and stuff like that.

> *[Hill]*: Yes, sir.

> *[Detective Quinn]*: When we were back there you said you wanted to continue talking. Is that right[?]

> *[Hill]*: Yes, sir.

> *[Detective Quinn]*: I need to know for sure now. I haven't, I haven't asked you any questions. I haven't prompted you to continue talking. Nothing like that. Right?

> You told me you wanted to continue talking, right? Is that fair[?]

> *[Hill]*: Yes, sir.

> *[Detective Quinn]*: Okay. I haven't promised you anything, right? You thought about it and you said you wanted to keep talking, but I haven't asked you anything since we left and you said you wanted an attorney, correct?

> *[Hill]*: Yes.

> *[Detective Quinn]*: Okay. Do you want to keep talking to us[?]

> *[Hill]*: Yes, sir.

Thereafter, Hill confessed his involvement as the driver during the robbery both orally and in a written statement.

Before trial, Hill filed a motion in limine seeking to suppress his custodial statements, arguing, in pertinent part, that the police engaged in coercive interrogation tactics that rendered such statements involuntary. After considering the matter, the trial court denied Hill's motion to suppress his custodial statements, reasoning (1) that Hill's statement about a lawyer—i.e., "Can I get a lawyer because I am defending myself[?]"—was, "given the context of the conversation," a statement that a reasonable officer would have perceived as a question whether Hill was still entitled to counsel, not an unequivocal invocation of the right to counsel, (2) that because Hill had no "absolute right to tell the police his side of the story," the detectives did not act improperly by forcing Hill to choose between either exercising his right to counsel or giving the police a statement, and (3) that based on the totality of the circumstances (including Hill's educational level, physical condition, prior criminal history, and the length of his detention and interrogation), neither Hill's custodial statements nor his *Miranda* waiver were involuntary.

On appeal, Hill argues that the trial court erred by so ruling. We disagree.

"The police are not required to read *Miranda* rights every time a defendant is questioned," *People v Littlejohn*, 197 Mich App 220, 223; 495 NW2d 171 (1992) (footnote omitted), and Hill does not contest that his *Miranda* waiver was voluntary when it was made. Instead, he claims that the detectives' conduct after he waived his *Miranda* rights effectively undermined those rights, leading to a confession that was involuntary.

-7-

"The burden is on the prosecution to prove voluntariness by a preponderance of the evidence." *People v Akins*, 259 Mich App 545, 564; 675 NW2d 863 (2003).

> Whether a statement was voluntary is determined by examining the conduct of the police. Factors to consider include:

>> The age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

>> The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made. [*Shipley*, 256 Mich App at 373-374 (quotation marks, citations, and brackets omitted).]

"[A] defendant's inculpatory statement is not inadmissible per se if induced by a promise of leniency. Rather, a promise of leniency is merely one factor to be considered in the evaluation of the voluntariness of a defendant's statements." *People v Givans*, 227 Mich App 113, 120; 575 NW2d 84 (1997). Similarly, untruthful comments made by the police may impact the voluntariness of the defendant's subsequent statements but will not render an "otherwise voluntary statement involuntary." *People v Hicks*, 185 Mich App 107, 113; 460 NW2d 569 (1990).

Here, after considering the totality of the circumstances, we conclude that the trial court did not err by refusing to suppress Hill's confessions. As depicted in the video recording of his interrogation, Hill suffers from hearing loss that requires him to wear hearing aids, but he was able to readily communicate with the detectives during his interrogation. There had been no unnecessary delay in his arraignment, and Hill was detained and interrogated only a short while before providing his confession—indeed, he had just been "booked." There is no evidence that Hill was injured, intoxicated, drugged, in ill health, or in need of food, sleep, or medical attention, and the recording of his interrogation demonstrates no physical abuse or threats of such abuse by the police. It is true that the detectives made several comments suggesting that it might be in Hill's best interest to confess before his coconspirators did so. However, Detective Quinn also expressly informed Hill that the detectives were not offering any "deals" or "promises." Further, although the detectives made several statements indicating that Hill would not be permitted to speak with them after speaking with an attorney, the detectives also advised him of

-8-

his *Miranda* rights at the outset of the interrogation—at which time Hill acknowledged that he was familiar with those rights—and during the ensuing interrogation the detectives repeatedly echoed that Hill had the right to speak with an attorney. On this record, there is no indication that Hill's age, intelligence, education level, or lack of prior experience with the police prevented him from exercising his free will about whether to provide a statement to the police. On the contrary, the fact that Hill initially invoked his right to counsel and ended the interrogation—despite the detectives' clear desire that he not to do so—strongly suggests that Hill *was* exercising his own free will and *was* aware of his rights.

For those reasons, we are convinced that the prosecution proved the voluntariness of Hill's confessions by at least a preponderance of the evidence. Consequently, the trial court did not err by denying Hill's motion to suppress those confessions.

## 2. PROSECUTORIAL MISCONDUCT[4]

While acknowledging that, "prior to trial the prosecution provided [Hill's] defense counsel with a videotape and transcript of [Hill's] custodial interview," on appeal Hill nevertheless argues that the prosecution should have disclosed additional information about the contents of the video recording. Specifically, Hill contends that the prosecution failed to disclose before trial that, while listening to the video recording of Hill's custodial interrogation, Detective Quinn "heard something different" than what appeared on the transcript of that interrogation. Thus, Hill argues, the prosecution violated the discovery rules enumerated by MCR 6.201 and deprived Hill of his right to a fair trial. We disagree.

In pertinent part, MCR 6.201 provides,

(B) Discovery of Information Known to the Prosecuting Attorney. Upon request, the prosecuting attorney must provide each defendant:

(1) any exculpatory information or evidence known to the prosecuting attorney;

(2) any police report and interrogation records concerning the case, except so much of a report as concerns a continuing investigation;

---

[4] We employ the phrase "prosecutorial misconduct" as a term of art synonymous with "prosecutorial error," not as an indication that the prosecution engaged in intentional misconduct. See *People v Jackson*, 313 Mich App 409, 425; 884 NW2d 297 (2015) ("[A]lthough the term 'prosecutorial misconduct' has become a term of art often used to describe any error committed by the prosecution, claims of inadvertent error by the prosecution are better and more fairly presented as claims of 'prosecutorial error,' with only the most extreme cases rising to the level of 'prosecutorial misconduct.' ") (quotation marks and citation omitted).

(3) any written or recorded statements, including electronically recorded statements, by a defendant, codefendant, or accomplice pertaining to the case, even if that person is not a prospective witness at trial;

\* \* \*

(H) Continuing Duty to Disclose. If at any time a party discovers additional information or material subject to disclosure under this rule, the party, without further request, must promptly notify the other party.

"There is no general constitutional right to discovery in a criminal case. Moreover, due process requires only that the prosecution provide a defendant with material, exculpatory evidence *in its possession*." *People v Greenfield*, 271 Mich App 442, 447 n 4; 722 NW2d 254 (2006) (quotation marks and citations omitted; emphasis added).

We find Hill's instant claim of error unpersuasive. Hill cites no evidence that the prosecution was *aware*, before trial, of how Detective Quinn would testify on redirect. Notably, the challenged testimony was not elicited by the prosecution as part of its direct examination of Detective Quinn. Instead, the topic of what Detective Quinn might have heard while listening to Hill's interview first arose during defense counsel's *cross-examination* of Quinn. On redirect, the prosecution delved back into such testimony, seeking to clarify it. Thus, on this record it is unclear whether the prosecution was aware how Detective Quinn would testify before he did so.

Moreover, even if the prosecution *was* aware of how Detective Quinn would testify, the prosecution's conduct did not violate the discovery rules set forth by MCR 6.201. The testimony in question was not *ex*culpatory but *in*culpatory, and thus MCR 6.201(B)(1) is inapplicable. Moreover, it is undisputed that the prosecution provided Hill with copies of his written and recorded statements, thereby satisfying MCR 6.201(B)(2) and (3). Hill cites no authority indicating that Detective Quinn's testimony about the custodial interrogation was also subject to pretrial discovery.

Finally, even if we were to assume that Detective Quinn's testimony was discoverable under MCR 6.201, that the prosecution was aware of that testimony before trial, and that the prosecution engaged in misconduct by failing to disclose such evidence, Hill is nevertheless unentitled to reversal on that ground. The trial court's jury instructions dispelled any potential prejudice from the alleged error. "Jurors are presumed to follow instructions, and instructions are presumed to cure most errors." *People v Petri*, 279 Mich App 407, 414; 760 NW2d 882 (2008). Here, the jury was twice instructed to rely on its own perception of the video recording, not on those of the court reporter who transcribed the interview or Detective Quinn. In the absence of any contrary evidence, we presume that the jurors followed their instructions in that regard, relying on their own perception of the video rather than Quinn's perception of it.

## B. DOCKET NO. 329209

### 1. REQUEST FOR COUNSEL

Defendant Robinson first argues that the trial court committed error requiring reversal by denying Robinson's motion to suppress incriminating custodial statements he made after asking whether he needed an attorney. We disagree.

> A criminal defendant has a constitutional right to counsel during interrogation. When a defendant invokes his right to counsel, the police must terminate their interrogation immediately and may not resume questioning until such counsel arrives. However, the defendant's invocation of his right to counsel *must be unequivocal*. If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning. [*Tierney*, 266 Mich App at 710-711 (quotation marks, citations, and brackets omitted; emphases added).]

"Thus, statements like 'Maybe I should talk to an attorney,' or 'I might want to talk to an attorney,' are insufficient to invoke a defendant's right to counsel and end questioning." *People v McBride*, 273 Mich App 238, 258-259; 729 NW2d 551 (2006), rev'd in part on other grounds 480 Mich 1047 (2008). Further, inquiries whether a defendant "need[s] or should have a lawyer" are "simply that, inquiries, not unequivocal demands for counsel." *Id.*

Here, Robinson's question—"Do I need a lawyer?"—was not a "request" for counsel; it was merely an inquiry whether he ought to have counsel. At best, a reasonable officer, under the circumstances, would have interpreted that question as intimating that Robinson *might* be considering *whether* to assert his right to counsel. Thus, Robinson's instant claim of error is meritless. The trial court did not err by denying Robinson's motion to suppress his confession.

### 2. MOTION TO SEVER JOINT TRIAL

Robinson next contends that the trial court abused its discretion by denying his motion to sever his trial from that of his codefendants. We disagree.

Robinson does not argue that his defense theory at trial was so inconsistent with that of his codefendants as to make such theories mutually exclusive or irreconcilable. Instead, Robinson argues that "spillover" evidence admitted against his codefendants prejudiced him. Robinson has failed, however, to specify what "testimony and evidence" constituted the "spillover," and he has also failed to provide any argument as to why the challenged evidence would not have been admissible against him had he been tried separately. Because this Court does not function as a research assistant for the parties before it, we will not provide such argument on Robinson's behalf. See *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001), quoting *Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) ("It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his

-11-

position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow."). On that basis alone, Robinson's instant claim of error necessarily fails.

Moreover, his "spillover" argument is directly contravened by this Court's recent decision in *Bosca*:

> There is no absolute right to separate trials, and in fact, a strong policy favors joint trials in the interest of justice, judicial economy, and administration. Severance should be granted when defenses are antagonistic. A defense is deemed antagonistic when it appears that a codefendant may testify to exculpate himself and to incriminate the defendant. Further, defenses must be not only inconsistent, but also mutually exclusive or irreconcilable. In other words, the tension between defenses must be so great that a jury would have to believe one defendant at the expense of the other. *Incidental spillover prejudice, which is almost inevitable in a multi-defendant trial, does not suffice.* [*Bosca*, 310 Mich App at 43-44 (quotation marks, citations, and brackets omitted; emphasis added).]

In tacit recognition that our Courts have decided that the introduction of spillover evidence is insufficient to warrant reversal in situations like the one now at bar, Robinson cites a federal decision, *United States v Breinig*, 70 F3d 850 (CA 6, 1995), for the proposition that spillover prejudice *can* be sufficient to warrant reversal. That citation is unavailing for several reasons. First, *Breinig* examined a motion "for relief from prejudicial joinder" under FR Crim P 14, not a motion pursued under Michigan law. *Id.* at 853. Second, *Breinig* does not bind this Court under the doctrine of stare decisis, whereas *Bosca* does. See MCR 7.215(J)(1); *People v Jackson*, 292 Mich App 583, 595 n 3; 808 NW2d 541 (2011) ("We are not bound by the decisions of federal courts or courts of other states . . . ."). Finally, *Breinig* is factually distinguishable from this case. The spillover evidence at issue in *Breinig* was "categorically inadmissible," "highly inflammatory" character evidence; specifically, it was evidence "that Breinig was an adulterous, mentally abusive, and manipulating spouse," which was wholly irrelevant to the charge against him: income tax evasion. Upon plenary review of the record, we discern no "highly inflammatory" spillover evidence like that at issue in *Breinig*.

Thus, Robinson's instant claim of error fails. Any incidental spillover prejudice he suffered from being tried jointly is insufficient to warrant reversal. See *Bosca*, 310 Mich App at 44.

### 3. JUROR ANONYMITY

Next, Robinson contends that the trial court's practice of referring to prospective jurors by jury numbers—instead of by name—constituted error warranting reversal. We disagree.

Because Robinson did not object to the trial court's practice of referring to prospective jurors by numbers, this issue is unpreserved and our review for plain error affecting Robinson's substantial rights. *Hanks*, 276 Mich App at 92. "An 'anonymous jury' is one in which certain information is withheld from the parties, presumably for the safety of the jurors or to prevent harassment by the public." *People v Williams*, 241 Mich App 519, 522; 616 NW2d 710 (2000).

-12-

"[T]he use of an 'anonymous jury' may promote the safety of prospective jurors, but at a potential expense to two interests of the defendant: (1) the defendant's interest in being able to conduct a meaningful examination of the jury and (2) the defendant's interest in maintaining the presumption of innocence." *Id.* at 522-523. Hence, "[i]n order to successfully challenge the use of an 'anonymous jury,' the record must reflect that the parties have had information withheld from them, thus preventing meaningful voir dire, or that the presumption of innocence has been compromised." *Id.* at 523.

As was true in *Hanks*, 276 Mich App at 94, the record in the instant case provides "no indication that any of the jurors believed that there was any significance in the use of numbers instead of names. Further, [Robinson has] failed to demonstrate that the use of numbers prevented him from conducting meaningful voir dire or that his presumption of innocence was compromised." "Thus, [Robinson] has not established that plain error affected his substantial rights." See *id*.

Additionally, even if Robinson *could* establish that the trial court's practice of referring to prospective jurors by jury numbers constituted plain error, he has failed to establish that the purported error was outcome determinative. Given that Robinson confessed his involvement in the crimes with which he was charged, the trial court's practice of referring to prospective jurors by jury numbers could not have actually prejudiced Robinson.

## 4. SUFFICIENCY OF THE EVIDENCE

Finally, Robinson argues that there was insufficient evidence for a rational trier of fact to conclude that Robinson was guilty of aiding and abetting felony-firearm. We again disagree.

"The felony-firearm statute applies whenever a person carries or has a firearm in his possession when committing or attempting to commit a felony." *People v Moore*, 470 Mich 56, 62; 679 NW2d 41 (2004).

> Establishing that a defendant has aided and abetted a felony-firearm offense requires proof that a violation of the felony-firearm statute was committed by the defendant or some other person, that the defendant performed acts or gave encouragement that assisted in the commission of the felony-firearm violation, and that the defendant intended the commission of the felony-firearm violation or had knowledge that the principal intended its commission at the time that the defendant gave aid and encouragement. [*Id.* at 70-71.]

"In determining whether a defendant assisted in the commission of the crime, the amount of advice, aid, or encouragement is not material if it had the effect of inducing the commission of the crime." *Id.* at 70.

Here, viewing the record evidence and its reasonable inferences in the light most favorable to the prosecution, there was sufficient evidence for a rational trier of fact to conclude that Robinson was guilty of aiding and abetting felony-firearm. It is undisputed that Diaz-Gaskin and Grayson committed felony-firearm by possessing firearms during the commission of the armed robbery. While entering the store with Diaz-Gaskin and Grayson—who were already visibly brandishing firearms—Robinson assisted in the placing of a block in the doorway to

permit escape, and he also collected money from the cash register. Both of these were acts that assisted in the commission of the felony-firearm violations committed by Robinson's codefendants. Based on the circumstances, a rational trier of fact could infer that Robinson either intended the commission of the felony-firearm violations committed by Diaz-Gaskin and Grayson or knew, when he aided them, that they intended to commit such violations.

## C. DOCKET NO. 329223

### 1. EFFECTIVE ASSISTANCE OF COUNSEL

Because Diaz-Gaskin did not move for either a new trial or a *Ginther*[5] hearing in the trial court, our review is for error apparent on the record. *Lockett*, 295 Mich App at 186; *People v Sabin (On Second Remand)*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000). A criminal defendant bears the burden of proving the factual predicate for a claim of ineffective assistance of counsel. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

> Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. To establish an ineffective assistance of counsel claim, a defendant must show that (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. A defendant must also show that the result that did occur was fundamentally unfair or unreliable. [*Lockett*, 295 Mich App at 187 (citations omitted).]

The "reviewing court must not evaluate counsel's decisions with the benefit of hindsight," but should "ensure that counsel's actions provided the defendant with the modicum of representation" constitutionally required. *People v Grant*, 470 Mich 477, 485; 684 NW2d 686 (2004), citing *Strickland v Washington*, 466 US 668, 689; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

Defendant Diaz-Gaskin argues that his trial counsel performed ineffectively in three distinct ways. Thus, Diaz-Gaskin contends, he is entitled to a new trial. We disagree.

First, Diaz-Gaskin argues that his trial counsel performed ineffectively by failing to move to sever Diaz-Gaskin's trial from that of his codefendants or for a separate jury. We need not reach the issue of whether counsel's performance in this regard fell below an objective standard of reasonableness under prevailing professional norms. Even assuming, arguendo, that Diaz-Gaskin's trial counsel *should* have filed a motion to sever, Diaz-Gaskin is nevertheless unentitled to a new trial on that ground. Diaz-Gaskin confessed his involvement in the robbery, both orally and in writing. Given such overwhelming evidence of guilt, Diaz-Gaskin has demonstrated no reasonable probability that, had he been tried separately or before a separate jury, the result of the proceedings below would have been different. For that same reason, Diaz-Gaskin has not shown that the result below was fundamentally unfair or unreliable.

---

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Second, Diaz-Gaskin argues that his trial counsel performed ineffectively by failing to move to suppress Diaz-Gaskin's confession. Despite the fact that he bears the burden of proving the factual predicate for his claim of ineffective assistance, see *Hoag*, 460 Mich at 6, Diaz-Gaskin has failed to provide this Court with the video recording or transcript of his custodial interrogation. Hence, he cannot overcome the strong presumption that his trial counsel performed effectively. "[C]ounsel cannot be faulted for failing to raise an objection or motion that would have been futile," *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998), and without a complete record of the totality of the circumstances surrounding Diaz-Gaskin's custodial interrogation, it is impossible to gauge whether a motion to suppress his confession might have been successful, see *Tierney*, 266 Mich App at 707 ("Whether a defendant's statement was knowing, intelligent, and voluntary is a question of law, which the court must determine under the *totality* of the circumstances.").

Finally, in his Standard 4 brief, Diaz-Gaskin argues that his trial counsel "intimidated" Diaz-Gaskin into waiving his right to testify, thereby prejudicing him. There is no record evidence substantiating Diaz-Gaskin's allegations that his trial counsel took steps to intimidate him against testifying at trial. On the contrary, the record evidence belies Diaz-Gaskin's allegations.[6] Moreover, because it constitutes an improper attempt to expand the record on appeal, we refuse to consider the affidavit Diaz-Gaskin appended to his Standard 4 brief as evidentiary support for this issue. See *Williams*, 241 Mich App at 524 n 1 ("[P]arties cannot enlarge the record on appeal by the use of affidavits."). Because Diaz-Gaskin has failed to prove the requisite factual predicate to substantiate his instant claim of error, he is unentitled to appellate relief.[7]

## 2. SUFFICIENCY OF THE EVIDENCE

In his Standard 4 brief, Diaz-Gaskin posits that his felony murder conviction must be reversed because there was insufficient evidence for a rational trier of fact to conclude that he acted with malice. We disagree.

There are three essential elements for felony murder: (1) "the killing of a human being," (2) with malice, i.e., "with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable

---

[6] At trial, Diaz-Gaskin's counsel informed the court that he had engaged in "extensive discussions" with Diaz-Gaskin about "the pros and cons of testifying" at trial, and that Diaz-Gaskin realized that the ultimate decision was his. When asked whether that was true, Diaz-Gaskin replied, "Yes." Upon questioning by the court, Diaz-Gaskin acknowledged that it was his own choice not to testify.

[7] Moreover, even assuming, arguendo, that all of Diaz-Gaskin's factual allegations are true, he has nevertheless failed to rebut the presumption that his counsel performed effectively. Diaz-Gaskin argues that his counsel's advice prompted him to not testify, but he does not argue that his counsel's advised him of anything *untrue*. In other words, Diaz-Gaskin has failed to demonstrate that counsel's advice was *bad* advice.

result," (3) "while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b)."[8] *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009); see also *People v Comella*, 296 Mich App 643, 651-652; 823 NW2d 138 (2012).

After jumping onto the countertop, Diaz-Gaskin "tracked" the victim before firing, and based on such behavior, Detective Quinn opined that the shooting was a deliberate act. Also, after the victim was shot and fell to the ground, Diaz-Gaskin continued to aim his handgun at the victim. Based on such conduct, a rational trier of fact could infer that Diaz-Gaskin intended to shoot the victim, and thus acted with malice.

### 3. SECOND-DEGREE MURDER INSTRUCTIONS

Finally, in his Standard 4 brief, Diaz-Gaskin argues that the trial court violated Diaz-Gaskin's constitutional "right to a properly instructed jury when it failed to instruct the jury on all the elements of the necessarily included lesser offense of second degree murder," failing to instruct the jury regarding the third element, i.e., that the murder was committed without justification or excuse. On that basis, Diaz-Gaskin contends that he is entitled "a new trial, or, in the alternative, reduction of the [felony murder] conviction to second degree murder and a resentencing on that charge." We disagree.

Because Diaz-Gaskin did not object to the trial court's second-degree murder instruction below, our review is for plain error affecting his substantial rights. *People v Fletcher*, 260 Mich App 531, 558; 679 NW2d 127 (2004); *Alter*, 255 Mich App at 204. Diaz-Gaskin is correct that the trial court's second-degree murder instruction did not state *all* of the elements associated with second-degree murder. See *People v Bergman*, 312 Mich App 471, 487; 879 NW2d 278 (2015) ("The elements of second-degree murder are '(1) a death, (2) the death was caused by an act of the defendant, (3) the defendant acted with malice, and (4) *the defendant did not have lawful justification or excuse for causing the death.*' ") (emphasis added), quoting *People v Smith*, 478 Mich 64, 70; 731 NW2d 411 (2007). However, as is recognized in the use notes accompanying the pertinent model jury instruction, M Crim JI 16.5, the fourth element (i.e., absence of a lawful justification or excuse for the homicide), "may be omitted if there is no evidence of justification or excuse, and the jury is not being instructed on manslaughter or any offense less than manslaughter."[9] Given the dearth of evidence of any lawful justification or excuse for the victim's murder, and the fact that Diaz-Gaskin was not charged with manslaughter or any offense less than manslaughter, it seems that the trial court did not plainly err by omitting the fourth element for second-degree murder.

---

[8] The predicate felony for Diaz-Gaskin's felony murder conviction was robbery, which is an enumerated predicate felony under MCL 750.316(1)(b).

[9] It is axiomatic that "the standard criminal jury instructions . . . are not binding authority." See, e.g., *People v Williams*, 288 Mich App 67, 76; 792 NW2d 384 (2010). Given the circumstances, however, we consider M Crim JI 16.5 as persuasive authority about whether the trial court *plainly* erred.

-16-

Additionally, even assuming that the trial court's failure to give the element in question *did* constitute plain error, Diaz-Gaskin's instant claim of error nevertheless fails because the purported error did not prejudice his substantial rights. If anything, the inclusion of the fourth element for second-degree murder would have made it *more* difficult for the jury to find Diaz-Gaskin guilty of that lesser included offense instead of felony murder. It is, after all, less difficult to satisfy three elements than to satisfy four. In other words, the failure to instruct the jury on all four elements of the lesser included offense of second-degree murder actually favored Diaz-Gaskin. That the jury nevertheless found him guilty of felony murder—not second-degree murder—is conclusive that the purported instructional error did not prejudice Diaz-Gaskin. See *People v Orlewicz*, 293 Mich App 96, 110-111; 809 NW2d 194 (2011) ("Given that defendant was convicted of the alternative theory of first-degree premeditated murder, for which the jury received a lesser-offense instruction on second-degree murder, defendant cannot establish that he was prejudiced by counsel's failure to request a second-degree-murder instruction.").

## IV. CONCLUSION

Having found no errors entitling defendants to reversal or a new trial, we affirm their convictions and sentences.

/s/ Kurtis T. Wilder
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly

-17-